# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA CAROLYN STILLS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:17-cv-0486 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF CYNTHIA STILLS AND AGAINST DEFENDANT NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Cynthia Carolyn Stills asserts she is entitled to benefits under the Social Security Act. Plaintiff argues the administrative law judge erred in assessing in evaluating the medical evidence related to her mental abilities. Because the ALJ failed to identify specific and legitimate reasons rejecting the opinions of an examining physician related to Plaintiff's social functioning, the decision is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## **PROCEDURAL HISTORY**

Plaintiff filed applications for disability insurance benefits and supplemental security income in September 2013, alleging disability beginning on March 23, 2009. (Doc. 11-6 at 2-9) The Social Security Administration denied her application at the initial level on November 14, 2013, and upon

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant in this action.

1

reconsideration on February 20, 2014. (*See generally* Doc. 11-4; Doc. 11-3 at 14) After requesting a hearing, Plaintiff testified before an ALJ on August 19, 2015. (Doc. 11-3 at 14, 34)

The ALJ noted that a prior application for benefits was denied on September 9, 2011, upon a finding that Plaintiff "retained the residual functional capacity to perform a range of work at the light level of exertion with asthma precautions and [limitation] to simple and repetitive tasks." (Doc. 11-3 at 14) The ALJ determined the presumption of continuing non-disability did not apply, because Plaintiff "presented new and material evidence warranting a change in her residual functional capacity." (*Id.*) However, the doctrine of res judicata applied, and as a result, Plaintiff was deemed disabled through September 9, 2011. (*Id.*) Thus, only the unadjudicated period—beginning September 10, 2011—was relevant to the ALJ's decision. (*Id.*)

The ALJ determined Plaintiff was not disabled and issued an order denying benefits on November 30, 2015. (Doc. 11-3 at 14-27) When the Appeals Council denied Plaintiff's request for review of the ALJ's decision on January 31, 2017 (*id.* at 2-5), the ALJ's findings became the final decision of the Commissioner of Social Security.

## **STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).
///

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. § 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial evidence and objective medical evidence. 20 C.F.R. § 416.927.

**A.     Relevant Medical Evidence**[2]

In March 2011, Dr. Daniel Brooks noted Plaintiff had been diagnosed with major depressive disorder, that she had "situational difficulties" and been diagnosed with major depressive disorder, recurrent. (Doc. 11-9 at 23) He also noted Plaintiff had been prescribed Celexa and Trazadone and

---

[2] Plaintiff disputes the ALJ's evaluation of medical opinions related to her mental impairments and does not challenge the ALJ's findings related to her physical abilities. Therefore, the Court summarizes only the medical evidence related to Plaintiff's mental limitations and abilities.

increased her dosage for both medications. (*Id.*) Plaintiff indicated she wanted therapy, and Dr. Brooks noted that she would start psychotherapy at the Community Mental Health Center Clinic. (*Id.* at 23-24)

Dr. Archimedes Garcia saw Plaintiff at the clinic in June 2011, and noted Plaintiff was "not in acute distress, cooperative, nice and pleasant to talk to." (Doc. 11-9 at 21) Dr. Garcia noted Plaintiff report she "still [had] bouts of depression with mild vegetative symptoms," as well as "difficulty in focusing even to simple task[s]." (*Id.*) Dr. Garcia opined Plaintiff's mood appeared depressed and anxious, and her affective range was labile. (*Id.*) He believed Plaintiff's response to medication had "improved," and she exhibited normal insight and judgment. (*Id.*) Dr. Garcia gave Plaintiff a GAF score of 55, also noting that the score earlier in the year was 43.[3] (*Id.*)

In September 2011, Plaintiff told Dr. Garcia that she had "not been doing well." (Doc. 11-9 at 19) She explained she felt she was "doing better over the past year of treatment but [felt] the last three weeks she … [was] 'slipping' and feeling worse." (*Id.*) Plaintiff said she had mood swings; was feeling irritable, anxious, and nervous; and had been "isolating and having crying spells 4 times per week for about 20 minutes each episode." (*Id.*) Further, Plaintiff reported that she heard "negative voices and [saw] shadows at night in bed." (*Id.*) Dr. Garcia observed that Plaintiff's thought process appeared organized and thought content was normal. (*Id.*) However, he indicated Plaintiff's mood was depressed, anxious, and irritable. (*Id.*) Dr. Garcia again gave Plaintiff a GAF score of 55. (*Id.*) He prescribed Seroquel for Plaintiff to take with the Celexa and Trazadone. (*Id.* at 20)

On January 19, 2012, Plaintiff visited the emergency department of Community Medical Center, requesting a "refill for psyche meds" and "to be seen by a social worker." (Doc. 11-8 at 33) Plaintiff reported she was "unable to afford" her medication, and she had been out of it for a week." (*Id.*) Dr. Cameron Jones observed that Plaintiff appeared "nervous/anxious" and "exhibit[ed] a depressed mood." (*Id.* at 33-34) Plaintiff received a "dose of seraquel and citalopram," as well as a

---

[3] Global Assessment of Functioning ("GAF") scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV).
A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34. A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id.* at 34.

prescription for the medication. (*Id.* at 34) Dr. Jones also directed Plaintiff "to go to [an] outpatient psychiatrist" for a medication adjustment. (*Id.*)

A week later, Plaintiff had an appointment with Dr. Garcia, who observed that Plaintiff was "still depressed." (Doc. 11-9 at 17) Dr. Garcia opined Plaintiff also appeared anxious and irritable, with a blunt affect. (*Id.*) Dr. Garcia did not alter the medication plan. (*See id.* at 18, 20)

Plaintiff had an appointment with Dr. Garcia in April 2012, at which time she described "lots of psychosocial stressors." (Doc. 11-9 at 15) Dr. Garcia noted Plaintiff appeared somewhat agitated and paranoid, anxious, irritable, and depressed. (*Id.*) He administered the Rey Memorization Test, and noted Plaintiff's score was "6/15." (*Id.* at 16) Dr. Garcia increased Plaintiff's dose of Seroquel from 100mg to 400mg. (*Id.*)

In August 2012, Dr. Garcia observed that Plaintiff "appeared real depressed, irritable with low frustration tolerance." (Doc. 11-9 at 13) Plaintiff reported she was "unable to focus or concentrate nor maintain simple tasks." (*Id.*) Dr. Garcia opined Plaintiff's thought content was normal, but also indicated Plaintiff's thoughts demonstrated she felt helpless, hopeless, and worthless. (*Id.*) Dr. Garcia again opined Plaintiff's GAF score was 55. (*Id.*)

In February 2013, Plaintiff was seen by Elisa Salazar, NP, at the Community Mental Health Center. (Doc. 11-9 at 11) Ms. Salazar noted Plaintiff had missed two appointments, and her last one was missed due to an emergency appendectomy. (*Id.*) Plaintiff reported that she had been out of medication for 3-4 weeks. (*Id.*) She said she was "tired of everything and everybody" and she would "stay in the house." (*Id.*) Plaintiff stated it was "too much" for her to deal with the public," and her irritability had increased without the medication. (*Id.*) Ms. Salzar opined Plaintiff's thoughts indicated feelings of helplessness and hopelessness, and Plaintiff's mood was depressed, anxious, and irritable. (*Id.*) Ms. Salazar again prescribed Seroquel, Celexa, and Trazodone, and recommended that for two weeks, Plaintiff take half the dosage since she had been off the medication for a month. (*Id.* at 12)

On April 2, 2013, Plaintiff and Anita Karsha, LMFT, determined a plan of care for Fresno County Behavioral Health. (Doc. 11-9 at 31-) Plaintiff indicated she wanted help because she had "issues with people." (*Id.*) She explained that she was depressed "4 days out of 7 days," had crying episodes "3 days out of 7 days," and engaged in isolative behavior "7 days out of 7 days." (*Id.*)

According to Ms. Karsha, Plaintiff's medical history included the following diagnoses: major depressive disorder, recurrent, with psychotic features; panic disorder without agoraphobia; generalized anxiety disorder; polysubstance dependence; and adjustment disorder with depressed mood. (*Id.* at 32) Ms. Karsha believed Plaintiff's thought flow was rational and coherent, and her thought content was within normal limits. (*Id.* at 36) Plaintiff reported she had "fear in crowds and others being behind her since being, literally, stabbed in the back." (*Id.* at 37) Ms. Karsha diagnosed Plaintiff with major depressive disorder and post-traumatic stress disorder. (*Id.*)

In early July 2013, Plaintiff had a "telemed" psychiatric appointment with Dr. Daniel Brooks. (Doc. 11-9 at 9) Dr. Brooks noted that Plaintiff reported "feeling depressed and [having] moments of anger," though she believed her "medications usually [did] help." (*Id.*) According to Dr. Brooks, Plaintiff appeared depressed and anxious, with a blunted affect. (*Id.* at 9-10) Dr. Brooks diagnosed Plaintiff with major depressive disorder, recurrent, noting she had "a long history of depression." (*Id.* at 10) Dr. Brooks gave Plaintiff a GAF score of 55. (*Id.*)

Dr. Ekram Michiel performed a consultative psychiatric evaluation on July 19, 2013. (Doc. 11-8 at 15) Plaintiff described her mental health impairments as depression and anxiety. (*Id.* at 15) She told Dr. Michiel that in 1996 she was arrested for a sex crime, for which she spent a year in prison and was required to register as a sex offender. (*Id.*) According to Plaintiff, her depression started while she was in prison, and her youngest son was taken from her. (*Id.*) She also informed Dr. Michiel that a friend beat her and "stabbed her severely" in 1998, after which Plaintiff began to have anxiety. (*Id.*) Plaintiff was "worrie[d] about being in crowded places," and could not "tolerate anyone walking behind her." (*Id.*) She described being "hypervigilant, guarded, [and] looking around," believing that "everyone is out … to get [her]." (*Id.*) She told Dr. Michiel that she preferred to stay home because it was "safer." (*Id.*) Plaintiff said she stopped working in 2009 when "someone found out about her past on the internet and the manager treated her very badly until she [was] forced to quit working." (*Id.* at 16) According to Dr. Michiel, Plaintiff appeared depressed, with an "intense, anxious, tearful" affect. (*Id.* at 17) He also observed Plaintiff "rubbing her hands constantly, shaking her legs," and crying during the examination. (*Id.*) Dr. Michiel found Plaintiff "was able to recall two out of three items after five minutes," and her "[r]emote memory did not show any impairment." (*Id.*) Dr. Michiel

diagnosed Plaintiff with anxiety and depression, opinion "[b]oth are comorbid illness to post-traumatic stress disorder." (*Id.* at 18) He indicated Plaintiff's stressors included her health condition and social stresses, and gave her a GAF score of 50.[4] (*Id.*) Dr. Michiel concluded:

> Based upon the evaluation and observation throughout the interview, I believe that the claimant is able to maintain attention and concentration to carry out simple repetitive job instructions.
>
> The claimant is unable to relate [to] and interact with coworkers, supervisors and the general public due to her paranoid ideation and flashbacks to the traumatic event.
>
> The claimant is unable to carry out an extensive variety of technical and/or complex instructions.

(*Id.* at 18)

In September 2013, Plaintiff visited Dr. Garcia, who noted that Plaintiff reported "feeling low" and rated her depression as "9 out of 10." (Doc. 11- 9 at 7) Plaintiff also told Dr. Garcia that she did not "feel comfortable in group settings," and she refused to leave the house by herself. (*Id.*) Dr. Garcia determined Plaintiff's through process was organized and her thought content was normal. (*Id.*) He observed that she appeared depressed and anxious, with a blunt affect. (*Id.*) Because Plaintiff reported a "very good response in the past" to Celexa, Trazodone, and Seroquel, Dr. Garcia reordered the medications. (*Id.* at 8) In addition, he added a prescription for Halcion for insomnia. (*Id.*)

The following month, Plaintiff told Dr. Garcia that she was "pretty good" and "sleeping pretty well." (Doc. 10-9 at 41) She said her mood was "kind of iffy" and went up and down, but her anger would "only last[] a few moments." (*Id.*) She continued to report that she had difficulty with crowds, and said she did "not socialize with people or friends" (*Id.*) Dr. Garcia believed Plaintiff's thought process, thought content, insight, and judgment were normal. (*Id.*)

Dr. Greg Ikawa reviewed medical records and completed a mental residual functional capacity assessment on October 10, 2013. (Doc. 11-4 at 14-15) Dr. Ikawa opined Plaintiff was not significantly limited with carrying out short and simple instructions. (*Id.* at 14) He determined that Plaintiff had social interaction limitations, and believed she was "[m]oderately limited" with the ability to interact appropriately with the general public. (*Id.* at 15) He opined Plaintiff was "[n]ot significantly limited"

---

[4] A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34.

7

with the ability to get along with coworkers or peers and to accept instruct instructions or criticism from supervisors. (*Id.* at 15) Dr. Ikawa concluded Plaintiff could perform simple, repetitive tasks, but needed "to limit public contact." (*Id.*)

In December 2013, Plaintiff reported that she was feeling more depressed, and she remained "socially isolated." (Doc. 11-10 at 39) Plaintiff said she believed the medications were working, but also admitted she felt worthless and hopeless. (*Id.*) In addition, she reported "increased problems with her memory such as not being able to remember peoples' names." (*Id.*, internal quotations omitted). Dr. Garcia observed that Plaintiff's mood was depressed and anxious, and she had a blunt affect. (*Id.*) He administered the Rey Memorization Test, and Plaintiff scored 8/15. (*Id.* at 40) Plaintiff was "encouraged to start group therapy and … [and] get a case manager." (*Id.*)

Dr. E. Murillo also reviewed the record and completed a mental residual functional capacity assessment on February 7, 2014. (Doc. 11-4 at 29-31) According to Dr. Murillo, Plaintiff's ability to interact with the general public was "[m]oderately limited." (*Id.* at 30) Dr. Murillo concluded Plaintiff could perform simple repetitive tasks, but needed "to limit public contact." (*Id.* at 30-31)

Plaintiff had a checkup with Dr. Garcia on February 20, 2014, at which time she reported having "up and down moods." (Doc. 11-12 at 12) Dr. Garcia observed that Plaintiff had a depressed mood with a blunted affective range, but her thought process, content, and insight were normal. (*Id.*) He noted Plaintiff began working with a case manager, and indicated she wanted to start attending group therapy. (*Id.* at 13)

In April 2014, Plaintiff reported that she continued to have depression, as well as "isolating" behavior. (Doc. 11-12 at 10) Dr. Garcia again opined Plaintiff's thought process, content, insight, and judgment were normal. (*Id.*) While Plaintiff indicated her medication was helpful, Dr. Garcia warned her "about the addictive properties of Halcion and asked [Plaintiff] to try to take one every other night." (*Id.*)

In July 2014, Dr. Garcia noted Plaintiff "report[ed] increased irritability and arguing with her neighbors." (Doc. 11-12 at 8) Plaintiff also "report[ed] staying in her home since March" because she feared that she would "end up in jail." (*Id.*) Dr. Garcia noted that Plaintiff described "continued depression, isolating, trouble focusing, feelings of worthlessness [and] hopelessness." (*Id.*) He

8

observed that Plaintiff's mood was depressed and irritable, but her affective range was normal. (*Id.*) Dr. Garcia gave Plaintiff a current GAF score off 55, and indicated that was also her highest score in the past 12 months. (*Id.*)

Plaintiff missed an appointment, and next saw Dr. Garcia in November 2014. (Doc. 11-12 at 6) She stated that she missed the appointment "due to having health issues," and reported that she had been recently diagnosed with sarcoidosis. (*Id.*) Plaintiff told Dr. Garcia that after the diagnosis, she felt "scared, worried and … depressed." (*Id.*) In addition, she said that she was "feeling irritable and confrontational with others." (*Id.*) Dr. Garcia believed Plaintiff appeared depressed and irritable, though her insight and judgment were normal. (*Id.*)

**B. Administrative Hearing Testimony**

Plaintiff testified before an ALJ at a hearing on August 19, 2015. (Doc. 11-3 at 34) She testified that she lived with her significant other and sons, who were fifteen and twenty years old. (*Id.* at 36) Plaintiff said she did not have a driver's license because it was taken for failure to pay child support. (*Id.* at 38) She stated she would "catch the bus maybe once a month" to see her doctor and go grocery shopping, unless she could get a ride from her boyfriend's brother-in-law. (*Id.* at 38-39)

When asked why she believed she was unable to work, Plaintiff stated she had anxiety and depression. (Doc. 11-3 at 42, 44) She stated that she would "get very anxious, really nervous" because she did not like a lot of people around. (*Id.* at 42) Plaintiff said any group of three or more people made her anxious. (*Id.*) She attributed her anxiety to being "stabbed… in the back" by someone she knew, which punctured her lung and required her to be hospitalized with a chest tube. (*Id.*)

Plaintiff testified that she last worked as an office assistant/receptionist for an insurance company in 2009. (Doc. 11-3 at 40) She said there were three people in the main office and "up to 25" telemarketers in the back. (*Id.* at 43) Plaintiff explained that she only worked with the individuals in the main office and did not deal with the telemarketers. (*Id.*) She stated that "[m]ost of the days" she got along with her coworkers, but she "really kind of kept to [her]self." (*Id.*)

She stated that during a typical day, she spent the day laying down in bed, watching television and movies, and doing housework. (Doc. 11-3 at 48-49) Plaintiff said she communicated only with her significant other and her family, including her mother, sister, and kids. (*Id.* at 51-52) She

estimated that she talked to her mother once a week and her sister once a month. (*Id.*) Plaintiff explained that she did not answer her phone or "carry conversations on with people." (*Id.* at 60) In addition, Plaintiff testified that she no longer participated in social activities such as attending church, social clubs, or "going out to the clubs," or visiting with her best friend. (*Id.* at 60-61)

**C.  The ALJ's Findings**

Pursuant to the five-step process, first the ALJ determined that Plaintiff did not engage in substantial gainful activity after the application date of September 4, 2013. (Doc. 11-3 at 16) At step two, the ALJ found:

> The claimant has the following severe impairments: degenerative joint disease in multiple joints; asthma; bilateral carpal tunnel syndrome; sarcoidosis of lunch with sarcoidosis of lymph nodes with erythema nodosum and mediastinal adenopathy; sarcoidosis with immunosuppression due to chronic steroid use; bronchial asthma; and major depressive disorder.

(*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or equaled a Listed impairment. (*Id.* at 17-18) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as described in 20 C.F.R. 416.967(b), including lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and walking for six hours; and sitting for six hours in an 8-hour workday, with the following restrictions: she can frequently hand, finger, feel, and grasp. She must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. She can perform simple repetitive tasks with no contact with the public and no more than occasional, superficial contact with co-workers and supervisors.

(*Id.* at 18) Based upon this RFC, the ALJ concluded Plaintiff was not capable of performing past relevant work. (*Id.* at 25) However, at step five the ALJ found "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.* at 26) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 27)

## **DISCUSSION AND ANALYSIS**

According to Plaintiff, the ALJ erred in evaluating the medical related to her social functioning limitations, including GAF scores identified in the record and limitations identified by Dr. Michiel. (Doc. 17 at 6-13) On the other hand, Defendant asserts that the ALJ properly discounted the opinion of Dr. Michiel and did not err in rejecting the GAF scores. (*See* Doc. 22 at 19-28) Therefore, Defendant asserts the Court should find the ALJ's decision is "supported by substantial evidence and free of reversible legal error." (*Id.* at 30)

A. **The ALJ's Evaluation of the Medical Record**

When evaluating the evidence from medical professionals, three categories of physicians are distinguished: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

1. GAF Scores

The ALJ noted that she "did not give any weight to the various GAF scores assessments." (Doc. 11-3 at 24) In doing so, the ALJ observed: "These scores represented only a snapshot of the claimant's functioning at that particular time, and not her functioning on an ongoing basis." (*Id.*)

Plaintiff contends the ALJ erred by rejecting her GAF scores, arguing the ALJ was obligated to treat the GAF scores as medical opinions from Drs. Garcia and Michiel. (Doc. 17 at 12-13) According to Plaintiff, "An ALJ is required to explain how the GAF assessment is necessarily inconsistent with the opinion evidence beyond boilerplate rejection." (*Id.* at 13, citing *Reddick v. Chater*, 157 F.3d 715,

725 (9th Cir. 1998)). On the other hand, Defendant argues that the ALJ did not err in rejecting the GAF scores because an "ALJ is not required to consider a GAF score in assessing disability." (Doc. 22 at 27, citing *Doney v. Astrue*, 485 Fed. App'x. 163, 165 (9th Cir. 2012) [holding "it was not error for the ALJ to disregard [the claimant's] GAF score" because it "does not have a direct correlation to the severity requirements in the Social Security Administration's mental disorders listings"])

In the Regulations, the Social Security Administration asserts it "will evaluate every medical opinion we receive," and defines medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including… symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Thus, an ALJ has an obligation to consider statements by physicians regarding a claimant's symptoms, diagnoses, and his prognosis. *See id.*

The Ninth Circuit has observed: "Although GAF scores alone do not measure a patient's ability to function in a work setting, [citation] the Social Security Administration (SSA) has endorsed their use as evidence of mental functioning for a disability analysis." *Craig v. Colvin*, 659 Fed. App'x 381, 382 (9th Cir. 2016), citing SSA Administrative Message 13066 (effective July 22, 2013). Accordingly, the Court determined an ALJ may rely in part upon GAF scores "as a method of quantifying treatment physicians' qualitative assessments of [a claimant's] overall functioning." *Id.* On the other hand, an ALJ may "not use [a] GAF score as an isolated measure of [a claimant's] ability to perform work." *Id.*

Previously, this Court found: "While [a] GAF score does not provide detailed information, it is nonetheless a statement that reflects a physician's judgment about the nature or severity of a patient's current condition. Thus, a GAF score assigned by a physician is a medical opinion about the level of the patient's functioning at that time." *Hinojos v. Astrue*, 2012 U.S. Dist. LEXIS 182787 (E.D. Cal. Dec. 28, 2012), citing, e.g., *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential … [and] the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."). Given the limited probative value, "an ALJ has no obligation to credit or even consider GAF scores in the disability determination." *Holcomb v. Colvin*, 2015 U.S. Dist. LEXIS 33036 (Mar.

17, 2015) (citation omitted). Indeed, the Ninth Circuit determined that an "ALJ's failure to address… GAF scores specifically does not constitute legal error." *Id.*, 288 Fed. App'x 357. It follows that the ALJ's rejection of a GAF score does not constitute legal error. *McFarland v. Astrue*, 288 Fed. App'x. 357 (9th Cir. 2008). Consequently, the Court finds the ALJ did not err by failing to evaluate the GAF scores as medical opinions of Drs. Garcia and Michiel.

2. Social limitations identified by Dr. Michiel

Examining the medical evidence, the ALJ summarized the conclusions of Dr. Michiel and explained the weight given to the opinions as follows:

> [C]onsultative psychiatrist Dr. Michiel opined that the claimant could maintain attention and concentration to carry out simple repetitive job instructions. She was unable to carry-out an extensive variety of technical or complex instructions. The claimant was unable to relate and interact with coworkers, supervisors, and the public. (Exhibit B4F, p. 8). This opinion was given some weight, however the evidence showed the claimant could tolerate occasional, superficial contact with co-workers and supervisors, and no contact with the public. These social restrictions are also inconsistent with Claimant's testimony regarding her activities of daily living which includes using public transportation such as the bus, going grocery shopping with her boyfriend and regularly communicating with her mother and children.

(Doc. 11-3 at 24) Plaintiff asserts that "the ALJ failed to give legally sufficient reasoning" to reject the limitations identified by Dr. Michiel related to Plaintiff's social interaction. (Doc. 17 at 6, emphasis omitted) Because the limitations identified by Dr. Michiel were contradicted by other physicians— including Drs. Ikawa and Murillo— the ALJ was required to set forth specific and legitimate reasons to support the decision to reject the opinions. *See Lester*, 81 F.3d at 830.

        *a.   Conflict with the record*

The Ninth Circuit determined that an ALJ may reject limitations "unsupported by the record as a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)). When an ALJ believes a physician's opinion is unsupported by the evidence, the ALJ has a burden to "set[] out a detailed and thorough summary of the facts *and conflicting clinical evidence*, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986) (emphasis added); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.").

The ALJ failed meet this burden to address the conflicts in the record, and she did not identify the evidence that she believed conflicted with the limitations identified by Dr. Michel. Rather, the ALJ offered only her conclusion that "the evidence showed the claimant could tolerate occasional, superficial contact with coworkers and supervisors and no contact with the public"—without any citations to the evidence.[5,6] (Doc. 11-3 at 24) Therefore, the purported conflict with the record is not a specific, legitimate reason for rejecting Dr. Rollins' opinions regarding Plaintiff's physical limitations.

> b. *Plaintiff's level of activity*

The Ninth Circuit determined an ALJ may reject an opinion when the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011) (concluding the ALJ set forth specific and legitimate reasons for rejecting a physician's opinion where the assessment was based upon the claimant's subjective complaints, and limitations identified by the doctor conflicted with the claimant's daily activities).

The ALJ concluded the social restrictions identified by Dr. Michiel were "inconsistent with Claimant's testimony regarding her activities of daily living which includes using public transportation such as the bus, going grocery shopping with her boyfriend and regularly communicating with her mother and children." (Doc. 11-3 at 24) Ultimately, the ALJ concluded Plaintiff could "perform simple repetitive tasks with no contact with the public and no more than occasional, superficial contact with co-workers and supervisors." (*Id.* at 18)

---

[5] As Defendant observes, the ALJ noted Drs. Ikawa and Murillo opined Plaintiff "could perform simple and repetitive tasks on a consistent basis with limited public contact." (*See* Doc. 22 at 20, quoting Doc. 11-3 at 25) Importantly, this observation was found *only* in a summary of the medical record, and was not cited in the ALJ's explanation of the weight given to Dr. Michiel's opinions. (*See* Doc. 11-3 at 24- 25) The ALJ failed to acknowledge the conflict between the opinions of these physicians and the opinions of Dr. Michiel—namely, whether Plaintiff could relate to and interact with coworkers and supervisors—and this was also an error.

[6] Defendant attempts to identify evidence that conflicts with the conclusions of Dr. Michiel, including findings in the mental residual functional capacity assessments from Drs. Ikawa and Murillo related to Plaintiff's abilities to "(1) ask simple questions or request assistance, (2) accept instructions and respond appropriately to criticism from supervisors, and (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (*See* Doc. 22 at 20, internal quotation marks omitted) However, as explained above, the ALJ fails to address the findings of the non-examining physicians in explaining the weight given to the opinion of Dr. Michiel. (*See* Doc. 11-3 at 24) The Court may not accept Defendant's post hoc explanations, and cannot affirm on grounds not invoked by the ALJ. *See Connett v. Barnhart,* 340 F.3d 871, 874 (9th Cir. 2003); *see also Burrell v. Colvin,* 775 F.3d 1133, 1138 (9th Cir. 2014) (explaining that the court could not consider the inconsistencies identified by the government and not the ALJ because the court is "constrained to review the reasons the ALJ asserts"). Consequently, the Court is unable to consider the inconsistences identified by the Commissioner.

14

Significantly, the ALJ failed to explain how Plaintiff's ability to take the bus once a month to go grocery shopping with the limitations identified by Dr. Michiel concerning her ability to relate to and interact with coworkers and supervisors. Likewise, the ALJ failed to explain how Plaintiff's ability to communicate with her mother once a week and her sister once a month conflicts with the opinion that Plaintiff could not interact with coworkers and supervisors—who are likely not family members and are unfamiliar with Plaintiff. Because the ALJ offered only her conclusion that Plaintiff's limited level of activity conflicts with the social limitations identified by Dr. Michiel, this factor does not support the decision to give less weight to the opinion.

**B.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Here, the ALJ failed to address the conflict between the conclusions of Dr. Michiel with the conclusions of Drs. Ikawa and Murillo. In addition, the ALJ failed to identify specific and legitimate reasons for rejecting the social functioning limitations that Dr. Michiel assessed after the consultative examination. Because the ALJ failed to resolve the conflicts in the record regarding Plaintiff's social functioning, the matter should be remanded for the ALJ to re-evaluate the medical evidence. *See Moisa*, 367 F.3d at 886.

**CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in her evaluation of the medical record related to Plaintiff's social limitations, and the Court should not uphold the administrative decision. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Cynthia Carolyn Stills and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **September 7, 2018**  **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE